IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARLON AUSTIN, | CIVIL DIVISION |
| Plaintiff, | Case No. 2:23-cv-686 |
| v. | |
| EOS ENERGY ENTERPRISES, | |
| Defendant. | |

**COMPLAINT AND JURY DEMAND**

A.   *Preliminary Statement*

1. The plaintiff Marlon Austin brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of his right to be free from employment discrimination based upon his race. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* A jury trial is demanded.

B.   *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3. On or about January 10, 2023, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2023-00816. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue dated April 10, 2023.

5. This Complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C.   **The parties**

6.   The plaintiff is an adult individual who resides in Irwin, PA (Westmoreland County).

7.   The defendant Eos Energy Enterprises ("Eos") is an entity doing business in the Commonwealth of Pennsylvania. At all times material, the defendant had a place of business located at within this district, specifically 200 Braddock Avenue, Turtle Creek, Allegheny County, PA 15145.

8.   The defendant designs, manufactures and sells battery storage solutions for the electricity industry.

9.   At all times material, the defendant employed more than fifteen employees.

10.   The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D.   **Factual Background**

11.   The plaintiff (African American) was employed by Eos from approximately November 7, 2020 through June 24, 2022.

12.   The plaintiff was hired as a welder. Because of his excellent job performance, the plaintiff was promoted to a lead after approximately two or three months.

13.   The plaintiff excelled in his position as a lead. In approximately July or August 2021, he was moved to supervisor in charge of the third shift.

14.   In approximately May 2022, the plaintiff was tapped for another role. He was assigned to be the supervisor of the "Weekend Warrior Shift," which ran from Fridays to Sundays, 12 hours a day. His responsibilities as supervisor of the Weekend Warrior Shift

included overseeing production, managing the work of the employees, taking care of payroll, meeting with management and providing reports.

15. The plaintiff performed all the functions of his job in a competent fashion and was considered to be an excellent worker. He continuously strived to go "above and beyond" when it came to his job.

16. The plaintiff's manager from approximately March 2022 through the termination of his employment was Paul Carroll (Caucasian).

17. Carroll made race-based comments to the plaintiff and black employees and treated the plaintiff and black employees differently than similarly situated white employees. Some examples follow:

(a) Carroll often referred to the plaintiff and black employees as "you people". There was a situation where a group of black welders were tasked with doing additional work in teams to increase productivity. The welders will willing to do this work but asked about receiving increased pay for the tasks. One morning, the plaintiff talked to Carroll about the welders' concerns. Carroll did not want to make a pay adjustment. He said that the black welders should not get additional pay because what they were already earning was "the most money you people ever made."

(b) Another example involved a disagreement between Clark Brooks, (African American), lead welder, and the plaintiff. Carroll told the plaintiff that the problem is that "you people don't know how to talk to each other."

(c) Carroll enforced attendance policies when it came to black employees, disciplining and/or terminating them for infractions, but did not do so when it came to white employees who engaged in the same attendance policy infractions.

(d) Several black employees complained to Human Resources regarding Carroll's disparate treatment and comments. However, upon information and belief, no corrective or disciplinary action was taken against Carroll, and, in any event, he did not change his behavior.

(e) Carroll undermined the plaintiff's authority with and management of the employees on the plaintiff's shift, often giving directions and orders that

conflicted with those of the plaintiff. This caused needless dissension among the ranks. Carroll did not do this with similarly situated white supervisors.

18. On approximately May 28, 2022, an issue arose regarding a job assignment involving an employee. The plaintiff told Myles Matthews (African American), welder, to work on the field line. Brooks intervened and told Matthews, "No, you're not going to listen to him; you're to go to the welding room and weld." Brooks said, "Paul [Carroll] told me that the employees don't have to listen to you." The plaintiff pointed out that he was the supervisor on this shift and that the employees had to follow his instructions.

19. In addition to Matthews and Brooks, Brenda Leggitt (African American), welder, Tyree [last name unknown] (African American), welder, Donte Jackson (African American), welder, Dontain Staples (African American), welder. Robert Giles (African American), step up supervisor, and Brodie Taybron (African American), welder, were present.

20. Brooks continued to insist that the employees did not have to listen to the plaintiff and called Justin Ingram (Caucasian), step up supervisor, on the phone. Ingram confirmed that Carroll had issued that directive. The plaintiff was incredulous and said, "How can Paul [Carroll] tell you not to listen to me when I am the supervisor?"

21. Brooks started yelling at the plaintiff. To diffuse the situation, the plaintiff said to the group of employees who had gathered around, including Matthews, "Okay, anyone who doesn't want to listen to me can get their stuff and go home and we'll deal with it in the morning." Some of the employees wanted to go home and started to leave. Another group of employees wanted to stay and work. Matthews seemed completely confused and was standing there as if he was not sure whether he should stay or leave. The plaintiff let him think about it for a minute and Matthews indicated that he would stay. The plaintiff acknowledged that,

touched him on the elbow in a comforting way and directed him to where he wanted Matthews to work. Matthews voluntarily went back to work; the plaintiff did not coerce or force him.

22. After this incident, Matthews continued to work shifts with the plaintiff as his supervisor; clearly, Matthews had no problem working under his supervision. Further, based upon information and belief, Matthews did not raise any complaints about the plaintiff touching him on his elbow.

23. On June 13, 2022, the plaintiff received a text from Austin Suber, manager, stating that Carroll wanted to talk to him. The plaintiff went over to the 200 building to see what Carroll wanted. Carroll told the plaintiff, "You gripped Myles [Matthews] up a couple of weeks back. That's unacceptable."

24. The plaintiff was surprised by this accusation. He told Carroll, "I didn't grip him up. I didn't have any issues with Myles. If I had any problem with Myles, I would have written up a report."

25. Carroll said, "Well, I don't know about that. That's not what Brooks said. We're looking into it." Carroll continued by telling the plaintiff that Brooks saw what had happened and had reported that the plaintiff had, in effect, physically assaulted Myles. (Brooks had been fired recently for being involved in a forklift accident that he did not report). The plaintiff told Carroll, "I can't believe that you're taking the word of a person who just got fired and lied about it! So, Clark [Brooks] lied to you before, what makes you think that he didn't lie about this?"

26. A couple of days later, the plaintiff was called into a meeting with Human Resources. The plaintiff was asked if he had "put his hands" on Matthews during the incident in May. The plaintiff denied assaulting Matthews in any way, "I didn't push him or anything like that; I just touched his elbow."

27. Unbeknownst to the plaintiff, Carroll engaged in an effort to get the plaintiff terminated as a result of this innocuous incident. He coerced some of the employees who were present into giving statements against the plaintiff and steered the "investigation" towards individuals whose answers could be swayed in one direction. It took more than a month to get everything lined up and fed to HR, but Carroll was persistent.

28. Upon information and belief, when Matthews was questioned by HR, he indicated that he wanted to stay and work that day and that the plaintiff had not coerced him. Further, he denied that the touch on his elbow constituted a physical assault or was in any way threatening or intimidating. The person from HR told Matthews, "that's not your decision to make; it's ours."

29. Upon information and belief, when Giles learned about the "investigation", he went to HR himself, without being asked, in an attempt to explain what had happened that day. HR was not interested in his version of events – which corroborated what the plaintiff had told HR – and was told that the company had a "zero tolerance" policy regarding any physical touching.

30. On June 24, 2022, the plaintiff was told to report to Human Resources and was instructed to bring his laptop with him. Steve Liach, (Caucasian), Plant Manager, and Dave Dunn (Caucasian), Director of HR were present. Dunn said, "We have a zero tolerance policy for putting your hands on someone" insinuating that the plaintiff tried to cause Matthews bodily harm. The plaintiff tried to explain what had happened and how the incidental touching of Matthews' elbow was not meant nor perceived as any physical assault. Dunn and Liach were not interested in the plaintiff's explanation and terminated the plaintiff's employment.

31. The reason given for the plaintiff's termination was nothing more than a pretext and the real reason that he was fired was because of his race. This "zero tolerance" policy is

selectively enforced. White supervisors and managers have violated this "zero tolerance" policy and were not subjected to discipline or termination.

## FIRST CAUSE OF ACTION

32. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

33. The plaintiff is African American and thus is protected against discrimination on the basis of his race pursuant to Title VII.

34. The plaintiff was qualified for his position.

35. While employed, a manager made race-based comments to the plaintiff and black employees and treated the plaintiff and black employees differently than similarly situated white employees.

36. Despite his qualifications, the plaintiff was terminated. The reasons given for his discharge were a pretext.

37. The defendant's discharge of the plaintiff was because of his race in violation of Title VII.

38. The defendant's violation of Title VII was committed with intentional or reckless disregard for the plaintiff's federally protected right to work in an environment free of race discrimination.

## SECOND CAUSE OF ACTION

39. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

40. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

WHEREFORE, the plaintiff respectfully requests judgment be entered in his favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA, including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*
Michael J. Bruzzese
Pa. I.D. No. 63306
220 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676

Counsel for the plaintiff

Dated: April 26, 2023